IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROND ROBERTS MCBRIDE, | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | |
| | : | |
| DON CAHOONE et al., | : | NO. 10-cv-3228 |
| Defendants. | : | |

MEMORANDUM

Legrome D. Davis, J.                                                              October 17, 2011

I.      Factual Background and Procedural History[1]

        On January 11, 2010, Plaintiff Rond Roberts McBride ("Plaintiff" or "McBride") pled

guilty to identity theft under 18 Pa. C.S.A. § 4120(a) in the Delaware County Court of Common

Pleas.  (Doc. No. 23 ¶ 23).  Judge James F. Nilon sentenced McBride to a "Min/Max" term of

incarceration of three (3) to twenty-three (23) months, followed by two (2) years of probation.

(Doc. No. 23 ¶ 24).  Judge Nilon ordered that McBride receive seven (7) days credit for time

served and serve the remaining eighty-three (83) days of his sentence on house arrest with

electronic monitoring pursuant to Defendant Delaware County Office of Adult Probation and

Parole Services' ("APPS") Electronic Monitoring ("EM") Program (Doc. No. 23 ¶ 25).

---

[1]This matter is before us on Defendants' Motion to Dismiss pursuant to Federal Rule of
Civil Procedure 12(b)(6).  Therefore, we set forth the facts as pled by Plaintiff Rond Roberts
McBride, construing the Complaint in the light most favorable to him.  In re Ins. Brokerage
Antitrust Litig., 618 F.3d 300, 314 (3d Cir. 2010).

Before McBride decided to plead guilty, Judge Nilon repeatedly assured McBride and his attorney, Ms. Denise McCrae, that McBride would not go to jail or prison if he accepted the Government's plea offer:

> THE COURT: The offer that they have extended to you is 3 to 23 months, with three months on electronic monitoring so you don't go to jail, you wear the bracelet, and after three months, they take the bracelet off...
>
> (Doc. No. 15, at 10:10-14).

> THE COURT: You're looking at essentially no prison time under the offer to substantial prison time if you're convicted...
>
> (Doc. No. 15, at 15:3-7).

> THE COURT: Three to 23 months is the period of incarceration. You're not going to have to go to jail because they're going to let you serve your minimum on electronic monitoring. Once they finish with the electronic monitoring, for the remainder of the 23 months, which would be 20 months, you are considered on parole...
>
> (Doc. No. 15, at 17:20-18:2).

> MS. MCCRAE: For the record, Your Honor, but no jail time.
>
> THE COURT: But no jail time.
>
> (Doc. No. 15, at 18:12-15).

> THE COURT: If there is a question in your mind as to whether or not you can win this case, then you have to give serious consideration to the offer because it doesn't carry any jail time with it.
>
> (Doc. No. 15, at 20:2-7).

Additionally, McBride expressed concern about caring for his mother while serving his

sentence. Judge Nilon told McBride that APPS should work with him to make the appropriate

arrangements, but Judge Nilon would give McBride a hearing on the issue if McBride could not

work it out with APPS.

| | |
|---|---|
| MR. MCBRIDE: | Yeah.  Well, I got to leave the state at times. |
| THE COURT: | Yeah.  Well, you have to talk to your probation officer or parole officer about that.  But I think arrangements could be made.  They'll work with you. |
| MR. MCBRIDE: | ...my mother... |
| THE COURT: | So you can visit your mother? |
| MR. MCBRIDE: | I got to take her back – she got [inaudible] so I go back and forth. |
| THE COURT: | I'm sure arrangements can be made. |
| MR. MCBRIDE: | That's why I want to get this over with. |
| THE COURT: | You can work with the person assigned to your case from Adult Probation and Parole.  Okay? |
| MR. MCBRIDE: | Okay. |
| THE COURT: | And if – and if they refuse to allow that, then you could file a petition through the Office of the Public Defender and I would give you a hearing on it. |
| MR. MCBRIDE: | Okay. |

(Doc. No. 15, at 58:13-59:18).

McBride was scheduled to have the EM equipment hooked up ("hook up appointment")

on January 27, 2010, but he called Defendant Don Cahoone, his probation officer, to reschedule

because he was in the hospital due to medical problems.  (Doc. No. 23 ¶¶ 28-29).  On February 3,

2010, McBride informed Cahoone that he was out of the hospital, and Cahoone scheduled a new

hook up appointment for February 20, 2010.  (Doc. No. 23 ¶¶ 30-31).  On February 19, the day

before the new hook up date, McBride told Cahoone that he had to undergo several medical tests,

including an MRI, on February 20, and Cahoone informed McBride that he should not get

hooked-up because the EM anklet cannot be worn during an MRI procedure.  (Doc. No. 23 ¶ 32).

Cahoone again rescheduled McBride's hook up appointment, this time for March 4, 2010.  (Doc.

No. 23 ¶ 33).  Despite McBride's apparent health-related issues, Cahoone told McBride that this

was "the last time" Cahoone would reschedule the appointment.  (Doc. No. 10 Ex. D).

        McBride spoke with Cahoone on March 4, 2010, at which time McBride told Cahoone

that he could not attend the scheduled hook up appointment because he was in the hospital with

his mother, who was having surgery.  (Doc. No. 23 ¶ 34).  Cahoone then requested that a bench

warrant be issued for McBride's arrest as provided in the EM Violation Policy (Doc. No. 23 ¶ 35;

Doc. No. 10 Ex. G, Chapter 7.18).  Judge Chad F. Kenney of the Delaware County Court of

Common Pleas issued the bench warrant on March 16, 2010.  (Doc. No. 33).

        McBride subsequently contacted Cahoone to schedule a new hook up appointment, but

Cahoone informed McBride about the bench warrant and told McBride to turn himself in because

"he would have to do the time (83 days) he was supposed to do on EMP in DCI."  (Doc. No. 23 ¶

37; Doc. No. 10 Ex. D).  McBride voluntarily surrendered on May 2, 2010 and, pursuant to the

EM Violation Policy, was immediately taken into custody and transferred to Delaware County

Prison to serve the remainder of his sentence.  (Doc. No. 23 ¶¶ 38-39).

        On May 13, 2010, McBride told Cahoone that he believed his rights were being violated

because he was entitled to a hearing before Judge Nilon, and McBride specifically requested that

Cahoone schedule the hearing.  (Doc. No. 23 ¶ 42).  Cahoone refused to schedule a hearing, telling McBride that "he has to do his min. sent. of 83 days regardless of his medical problems" and "if he needs to be out so bad have a lawyer file a habeas."  (Doc. No. 23 ¶¶ 42-44; Doc. No. 10 Ex. D).  McBride was not released from prison until he had served the remaining minimum term of his sentence.  (Doc. No. 23 ¶ 44).  From the time McBride surrendered, McBride never received a hearing of any kind regarding the EM violation that sent him to prison.  (Doc. No. 23 ¶¶ 38-45).

Chapter 7.18 of the Delaware County Adult Probation and Parole Policy and Procedure Manual (the "Manual" or "Policy and Procedure Manual") describes the Electronic Home Monitoring Program ("EMP" or "EM Program") procedures pursuant to which McBride was sent to prison without a hearing.  (Doc. No. 10 Ex. G).  The "authority" for Chapter 7.18 resides in the Director of APPS, a position currently held by Defendant Michael Raith.  (Doc. No. 10 Ex. G). According to Chapter 7.18 of the Manual, violations of the EM Program include, but are not limited to, (1) not being home for a scheduled hook up, (2) not responding to a probation / parole officer's attempts to schedule a hook up, and (3) missing an office appointment without a legitimate explanation.  (Doc. No. 10 Ex. G).  When a violation occurs:

> [The probation / parole] Officer will: Consult with supervisor concerning the violation.  At that time it may be determined that the violation can be handled with a warning slip.  If it is determined that the violation is severe, then a bench warrant is requested from the sentencing judge...*If the client was serving EMP as part of a 'Min/Max' sentence, he/she will serve the remainder of time left on the minimum in prison*...If the client was serving EMP as part of an Intermediate Punishment sentence or if it was ordered at a *Gagnon* hearing, the appropriate violation hearing will be requested by the probation officer.

(Doc. No. 10 Ex. G) (emphasis added).

In other words, the official EMP violation policy affords a hearing to those individuals serving EMP in some circumstances, i.e., if the individual is serving EMP as part of an intermediate punishment sentence or if EMP was ordered at a *Gagnon* hearing, but not others, i.e., when the individual is serving EMP as part of a "Min/Max" sentence.  McBride falls within the latter category and, pursuant to the policy, was not given a hearing.

On July 9, 2010, McBride brought this civil action under 42 U.S.C. § 1983 against Defendants Don Cahoone, his probation officer; Michael Raith, Director of APPS; and APPS, claiming that Cahoone's actions and Raith's / APPS' policy deprived McBride of his Fourteenth Amendment Due Process rights by denying him a hearing before sending him to prison for allegedly violating the EMP policy.  Defendants filed a motion to dismiss on August 15, 2011, Plaintiff responded on September 8, 2011, and the Court heard oral arguments on the motion on October 11, 2011.  Defendants' motion is now ripe for disposition, and for the reasons detailed below, we grant Defendants' motion in part and deny it in part.

II.    Legal Analysis

When considering a motion to dismiss under Rule 12(b)(6), we utilize the "plausibility" standard recently articulated by the Supreme Court in Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 554-56 (2007) and Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949-50 (2009).  To survive a motion to dismiss under this standard, the Plaintiff must plead factual allegations sufficient "to raise a right to relief above the speculative level...on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Twombly, 550 U.S. at 555-56.  The "mere possibility" of misconduct is not enough; the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible on its face*,'" i.e., sufficient facts to

permit "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S. Ct. at 1949-50 (emphasis added) (citation omitted).  In our analysis, we must construe the complaint in the light most favorable to the Plaintiff.  In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 314 (3d Cir. 2010).  However, while we must accept as true all allegations contained in the complaint, we need *not* give credence to mere "legal conclusions" couched as facts.  See Iqbal, 129 S. Ct. at 1949-50.

Our "plausibility" analysis proceeds in two steps.  First, we separate the factual and legal elements of a claim, accept all well-pleaded facts as true, and disregard any legal conclusions. Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009) (quoting Iqbal, 129 S. Ct. at 1950).  Second, we determine whether the facts alleged in the complaint sufficiently show that Plaintiff has a "plausible claim for relief."  Id.  In addition to the complaint itself, we may consider "matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case" to determine whether Plaintiff has stated a claim upon which relief may be granted.  Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1384-85 n.2 (3d Cir. 1994).

Defendants ask us to dismiss McBride's complaint in its entirety, arguing that (1) McBride had no protected liberty interest in serving his "Min/Max" sentence on house arrest, (2) the Supreme Court's rule in Heck v. Humphrey, 512 U.S. 477 (1994) bars McBride's claims, (3) McBride lacks standing to bring his claims for prospective relief, and (4) Defendants enjoy various forms of immunity with respect to McBride's claims.  We address each issue in turn and ultimately find Defendants' arguments unpersuasive.

7

A.    McBride Has A Constitutionally Protected Liberty Interest In Serving His "Min/Max" Sentence On Electronically Monitored Home Confinement As Opposed To Prison.

In 1972, the Supreme Court's seminal decision in Morrissey v. Brewer, 408 U.S. 471, 482 (1972) established that an inmate on parole has a liberty interest in retaining that status. Since Morrissey, courts around the country have recognized that those entangled in our criminal justice system enjoy a constitutionally protected liberty interest in an ever-increasing array of circumstances. First, in 1973, the Supreme Court extended Morrissey to cover probationers, declaring that probationers are entitled to the same due process protections as parolees. See Gagnon v. Scarpelli, 411 U.S. 778, 782 (1973) (holding that "a probationer, like a parolee, is entitled to a preliminary and a final revocation hearing, under the conditions specified in Morrissey v. Brewer.").

In 1995, the Tenth Circuit held that a pre-parolee has a Due Process-protected liberty interest in remaining in a program which permits a convict to exist, albeit conditionally, in society on a full-time basis. See Harper v. Young, 64 F.3d 563, 564-67 (10th Cir. 1995). The Harper court's rationale for finding a liberty interest is particularly compelling:

> *Edwards*, we think, correctly identifies the dispositive characteristic that marks the point at which the Due Process Clause itself implies a liberty interest: it is the fact of release from incarceration. The liberty associated with a life outside the walls of a penal facility dwarfs that available to an inmate. It is the freedom to "be gainfully employed," "to be with family and friends," and "to form the other enduring attachments of normal life." Morrissey, 408 U.S. at 482...It is the ability to reside in a home of one's own, without bars or fences or bonds, beyond the immediate authority of guards or wardens. The passage outside the walls of a prison does not simply alter the degree of confinement; rather, it works a fundamental change in the kind of confinement, a transformation that signals the existence of an inherent liberty interest and necessitates the full panoply of procedural protections outlined in Morrissey.

8

Harper, 64 F.3d at 566.  The Supreme Court affirmed the Tenth Circuit's decision in 1997.  See Young v. Harper, 520 U.S. 143 (1997).

In 1999, the Second Circuit held that an inmate on a work release program "enjoyed a liberty interest, the loss of which imposed a sufficiently 'serious hardship' to require compliance with at least minimal procedural due process."  Kim v. Hurston, 182 F.3d 113, 117-18 (2d Cir. 1999).  Also in 1999, the Third Circuit concluded that an inmate did not have a protected liberty interest in continuing to reside in a strictly monitored halfway house, but only because "[u]nlike the pre-parolee in Young,...[the inmate] never left institutional confinement.  In Young the pre-parolee lived in his own home."  See Asquith v. Dep't of Corrections, 186 F.3d 407, 410-11 (3d Cir. 1999).

More recently, in 2003, the Seventh Circuit held that "being removed from a home-detention program into jail is a sufficiently large incremental reduction in freedom to be classified as a deprivation of liberty."  Paige v. Hudson, 341 F.3d 642, 643-44 (7th Cir. 2003).  The court based its decision on the great difference "between being confined in a jail and being confined to one's home."  Id.

Finally, in 2010, the First Circuit held that prisoners in a Electronic Supervision Program (ESP), which permitted eligible inmates to wear electronic tracking anklets and complete the balance of their sentences outside of prison, had a recognized liberty interest in confinement within their homes.  See Gonzalez-Fuentes v. Molina, 607 F.3d 864, 886-90 (1st Cir. 2010).  The Gonzalez-Fuentes court's reason for recognizing a liberty interest in remaining on ESP mirrors the rationale provided by the Harper court in the pre-parolee context fifteen years earlier:

It is true that the electronic monitoring severely curtailed the privacy that the

9

appellees would traditionally enjoy in their homes. Yet if confinement within the home did not redound to their privacy, it still redounded to their liberty. The ESP, unlike institutional confinement of any kind, allowed the appellees to live with their loved ones, form relationships with neighbors, lay down roots in their community, and reside in a dwelling of their own choosing (albeit subject to certain limitations) rather than in a cell designated by the government. Even without creating an expectation of privacy, what the ESP afforded the appellees was included in the constitutionally protected prerogative to "establish a home."

Gonzalez-Fuentes, 607 F.3d at 890.

Although the aforementioned cases involve a variety of different factual situations, a common thread runs through all of the decisions: courts, including the Third Circuit, readily acknowledge the existence of a constitutionally-significant difference between living *at home,* even with restrictions, and serving a sentence in *institutional confinement*.  See, e.g., Gonzalez-Fuentes, 607 F.3d at 889 (discussing how "[o]ther circuits have emphasized the significance of the difference between confinement in an institutional setting and confinement within the home."); Asquith, 186 F.3d at 410-11 (distinguishing Young by emphasizing that the pre-parolee in Young lived in his own home as opposed to a halfway house, which was a form of institutional confinement).  The Pennsylvania Supreme Court agrees that institutional confinement fundamentally differs from home confinement.  See Commonwealth v. Kriston, 588 A.2d 898, 899 (Pa. 1991) ("The plain and ordinary meaning of imprisonment is confinement in a correctional or similar rehabilitative institution, not staying at home.  The qualitative differences in treatment experienced by one who is confined in an institution, as opposed to one who merely stays at home, are too numerous and obvious to require elaboration.").

Against that backdrop, consider the deprivation of liberty McBride suffered here.  A judge told McBride over and over that if he accepted the Government's plea offer, he would not

10

serve any time in jail or prison, but would instead carry out his sentence on electronically monitored home confinement.  McBride took the plea, but because of various health-related issues, he had to reschedule his hook up appointment several times.  After missing his last appointment, he was taken to prison without a hearing and forced to serve almost three months in institutional confinement instead of at home.

The decisions discussed *supra* firmly establish that the Fourteenth Amendment demands some minimal process before a state actor takes someone who is set to serve his sentence at home, on electronic monitoring, and instead puts him in prison or another form of  "institutional confinement."  Additionally, Chapter 7.18 of Defendant APPS' Policy and Procedure Manual explicitly recognizes that the EM Program is "[a]n *alternative sentence to prison incarceration* whereby the client serves an incarceration period in residence as opposed to prison."  (Doc. No. 10 Ex. G) (emphasis added).  Therefore, the Court has no doubt that Defendants' policies and actions that resulted in McBride serving his sentence in Delaware County Prison instead of his residence implicated McBride's Fourteenth Amendment liberty interest.

Defendants cite several lower court decisions purportedly cutting in the other direction, the most on-point of which is the Pennsylvania Superior Court's recent opinion in Commonwealth v. Stafford, No. 1866 EDA 2010, 2011 WL 4435959 (Pa. Super. Ct. Sept. 26, 2011).  In Stafford, Michael Stafford pled guilty to simple assault and was sentenced to three to twenty-three months incarceration.  Id., at *1.  Stafford was initially permitted to serve his sentence on electronic home monitoring, but he disappeared from his home monitoring address and, when found, was subsequently incarcerated.  Id.  In dicta, and without any analysis, the Stafford court noted in passing that "since [Stafford] had not been paroled at the time he

11

absconded, neither a *Gagnon I* or *II* hearing was necessary." Id.  This offhand comment does not persuade the Court that McBride had no liberty interest in serving his sentence on electronically monitored home confinement.

First, the Stafford court may simply have been observing that, because Stafford was neither a parolee nor a probationer, he was not entitled to a so-called *Gagnon* hearing since *Gagnon* hearings refer only to "parole and probation revocation proceedings."  See Stafford, 2011 WL 4435959, at *1 n.1.  This is a far cry from stating that individuals on an electronic home monitoring program have no protected liberty interest and are not entitled to any process at all before being removed from the program and sent to prison.  Further, to the extent Stafford can be read to imply that only probationers and parolees enjoy a protected liberty interest in retaining their statuses, Stafford is undoubtedly mistaken.  The Supreme Court has definitively determined that pre-parolees possess a similar liberty interest.  See Young v. Harper, 520 U.S. at 150-53.

For all the aforementioned reasons, we cannot conclude that McBride fails to state a plausible claim that he had a protected liberty interest in serving his sentence on electronically monitored home confinement as opposed to prison.  As such, we deny Defendants' motion to dismiss on these grounds.

B.    McBride's Claims Are Not *Heck*-Barred

Under Heck v. Humphrey, 512 U.S. 477, 486-87 (1994), a plaintiff cannot maintain a damages action if a favorable result in that action would necessarily imply that his past conviction or sentence was invalid.  However, this so-called "favorable termination" rule only applies when the plaintiff's claims implicate the fact or duration of his confinement. Specifically, in Torres v. Fauver, the Third Circuit held that "[t]he favorable termination rule

12

does not apply when a prisoner's § 1983 claims can implicate only the conditions, and not the fact or duration, of his confinement."  292 F.3d 141, 149-50 (3d Cir. 2002).  Because Torres' claims challenged "the procedures by which he was sentenced to disciplinary detention and administrative segregation" and not the length of his incarceration, "the success of his claim would not necessarily imply the invalidity of the fact or duration of his confinement," so Heck did not bar Torres' claims.  Id. (internal quotation marks omitted).

In a similar vein, the Supreme Court's decision in Spencer v. Kemna makes it clear that Heck does not foreclose a § 1983 claim in which a plaintiff seeks damages for a defendants' use of improper procedures, not for reaching an incorrect result.  See 523 U.S. 1, 17 (1998) (observing that "[i]f, for example, petitioner were to seek damages for using the wrong procedures, not for reaching the wrong result,...and if that procedural defect did not necessarily imply the invalidity of the revocation,...then Heck would have no application all.") (internal citations and quotations omitted).

Here, McBride challenges only the procedure by which he was sent to prison.  Namely, McBride asserts that he was entitled to some sort of hearing before Defendants refused to let him serve his sentence on electronically monitored home confinement.  McBride does not contest the fact or duration of his sentence, so a favorable result here would not "necessarily imply" that his conviction was unlawful.  Therefore, in the words of the Spencer v. Kemna Court, Heck has "no application at all" to McBride's claims, and his claims are not Heck-barred.

C.      McBride Has Standing To Pursue His Claims For Prospective Relief

Citing City of Los Angeles v. Lyons, 461 U.S. 95 (1983), Defendants argue that McBride lacks standing to bring claims for injunctive and declaratory relief because McBride alleges no

13

facts demonstrating that his injury is likely to be repeated.  Although this is a close question, we cannot conclude at this nascent stage of the proceedings that McBride lacks standing to assert his claims for prospective relief.

The three "irreducible" constitutional elements of standing are: (1) an injury in fact that is actual or imminent, not "conjectural" or "hypothetical"; (2) a causal connection between the injury and the conduct complained of—the injury must be fairly traceable to the challenged action of the defendant; and (3) a showing that it is likely, as opposed to merely speculative, that a favorable decision will redress the injury.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992).  Defendants' Lyons-based argument focuses on the "injury in fact" prong of the constitutional standing test.

In Lyons, Lyons claimed that Los Angeles police officers put him in an illegal chokehold during a traffic stop. 461 U.S. at 105.  Based on that incident, Lyons brought a § 1983 action seeking both monetary damages and prospective relief.  See id.  The Court concluded that, while Lyons presumably had standing to claim damages against the individual officers who choked him, and perhaps against the City, Lyons lacked standing to pursue his injunctive relief claims because his past run-in with the police "does nothing to establish a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his part."  Id.

To reach this result, the Lyons Court began by generally stating that "[a]bstract injury is not enough [for standing]. The plaintiff must show that he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct and the

injury or threat of injury must be both real and immediate, not conjectural or hypothetical."
Lyons, 461 U.S. at 101-02. (internal quotations and citation omitted).  Specific to Lyons, the
Court noted that "Lyons would have had not only to allege that he would have another encounter
with the police but also to make the incredible assertion either, (1) that all police officers in Los
Angeles always choke any citizen with whom they happen to have an encounter, whether for the
purpose of arrest, issuing a citation or for questioning *or, (2) that the City ordered or authorized
police officers to act in such manner*" in order to have standing to bring his claims for
prospective relief.  Id. at 105-06. (emphasis added).

      As evidenced by the preceding quotation, the Lyons Court rested its decision largely on
the fact that City policy did not authorize police officers to use illegal chokeholds, the conduct
complained of by Lyons.  See also id. at 110 ("Nothing in that policy, contained in a Police
Department manual, suggests that the chokeholds, or other kinds of force for that matter, are
authorized absent some resistance or other provocation by the arrestee or other suspect.").
Because the City's official policy did not sanction illegal chokeholds, the Court's belief that "it is
surely no more than speculation...that Lyons himself will again be involved in one of those
unfortunate instances, or that he will be arrested in the future and provoke the use of a
chokehold...." seems quite reasonable.  See id. at 108.

      Several courts have persuasively distinguished Lyons on the grounds discussed above,
holding that a plaintiff has standing to pursue claims for injunctive and declaratory relief to
combat a pattern of illicit behavior, particularly when the challenged conduct occurs pursuant to
an officially authorized policy.  For example, in LaDuke v. Nelson, 762 F.2d 1318 (9th Cir.
1985), the Ninth Circuit observed that the "Supreme Court has repeatedly upheld the

appropriateness of federal injunctive relief to combat a 'pattern' of illicit law enforcement behavior." Id. at 1324. The court distinguished Lyons by noting that "the district court in this case explicitly found that the defendants engaged in a standard pattern of officially sanctioned officer behavior violative of the plaintiffs' constitutional rights. Conversely, the Lyons opinion expressly noted the absence of any written or oral pronouncements by the Los Angeles Police Department sanctioning the unjustifiable application of the chokehold." Id. (internal citation omitted).

The Second Circuit reached a similar result in Deshawn E. by Charlotte E. v. Safir, 156 F.3d 340, 344-45 (2d Cir. 1998). In Safir, plaintiffs brought a § 1983 action seeking an injunction and declaratory relief against the allegedly coercive interrogation methods of the so-called "Detective Squads" that patrolled New York City Family Court buildings. See id. at 343-44. The court distinguished Lyons and held that the plaintiffs had standing to seek prospective relief because the challenged interrogation methods were officially sanctioned policies:

> [T]his case is distinguishable from Lyons because, in Lyons, there was no proof of a pattern of illegality as the police had discretion to decide if they were going to apply a choke hold and there was no formal policy which sanctioned the application of the choke hold. *In contrast, the challenged interrogation methods in this case are officially endorsed policies; there is a likelihood of recurring injury because the Squad's activities are authorized by a written memorandum of understanding between the Corporation Counsel and the Police Commissioner*....Thus, unlike Lyons, the City ordered or authorized [the Squad] to act in such manner,...and plaintiffs have standing to seek injunctive relief.

Safir, 156 F.3d at 144-45. (internal citation and quotations omitted) (emphasis added).

Most recently, Judge DuBois rejected a Lyons-based standing challenge in analogous circumstances in A v. Nutter, 737 F. Supp. 2d 341, 352-53 (E.D. Pa. 2010). In A v. Nutter, the City defendants argued that plaintiffs did not allege, and could not show, that "all or most of

16

DHS's caseworkers permit children under their supervision to be injured," so the plaintiffs did not have standing under <u>Lyons</u>.  <u>Id.</u> at 352.  Judge DuBois found that <u>Lyons</u> does not resolve the standing question when defendants act pursuant to an official policy:

> The <u>Lyons</u> Court...recognized that if Lyons had instead alleged that future injury was imminent because of an authorized policy—not just a random act by a minority of officers—his allegations would have properly invoked federal jurisdiction. Plaintiffs' averments in this case meet that standard enunciated by the <u>Lyons</u> Court in that they allege future injury is imminent because of a policy or custom either acquiesced in or authorized by the City Defendants.

<u>A v. Nutter</u>, 737 F. Supp. 2d at 352-53.

Here, Defendants acted according to an official policy in refusing McBride a hearing.  Specifically, as discussed *supra*, Chapter 7.18 of APPS' Policy and Procedure Manual does not afford a hearing to individuals who are serving EMP as part of a "Min/Max" sentence.  Instead, an individual such as McBride serving a "Min/Max" sentence on EMP "*will serve* the remainder of time left on the minimum in the prison" if he commits a violation.  (Doc. No. 10 Ex. G) (emphasis added).  We are persuaded by the sound reasoning in <u>LaDuke</u>, <u>Safir</u>, and <u>A v. Nutter</u> and conclude that McBride has sufficiently alleged an imminent injury based on Defendants' official policy.  While we are aware that in analyzing standing, courts generally decline to presume that a plaintiff will violate the law in the future, <u>see</u> <u>Thomas v. Jones</u>, 428 Fed. App'x 122, 124 (3d Cir. 2011) (citing <u>Honig v. Doe</u>, 484 U.S. 305, 320 (1988)), we believe the analysis does, and should, differ when an official policy mandates the allegedly unconstitutional conduct.  As recognized by <u>LaDuke</u>, <u>Safir</u>, and <u>A v. Nutter</u>, the presence of an official policy greatly increases the likelihood that any individual, including McBride, will imminently suffer the very same deprivation of liberty McBride claims to have suffered in the past.

D.    Defendant APPS Has Immunity Under The Eleventh Amendment

McBride's Complaint requests prospective (declaratory and injunctive) relief against Defendant APPS.  However, Defendant APPS has asserted a claim to Eleventh Amendment immunity, and Plaintiff now recognizes that "APPS is likely part of the Commonwealth for Eleventh Amendment purposes." (Doc. No. 30, at 28). Therefore, Plaintiff agrees that the claims against entity Defendant APPS may be dismissed.  (Doc. No. 30, at 28).  As such, Defendants' now-unopposed motion to dismiss McBride's claims against entity defendant APPS is granted.

E.    The Eleventh Amendment Does Not Bar Plaintiff's Suit Against Raith

McBride sued Defendant Raith, Director of APPS, in his official capacity, asking the Court for declaratory and injunctive relief against Defendant Raith's allegedly unconstitutional EM Program violation policy.  Although sovereign immunity under the Eleventh Amendment prevents a plaintiff from bringing a § 1983 suit against a state, "a person seeking purely prospective relief against state officials for ongoing violations of federal law may sue under the 'legal fiction' of Ex parte Young, 209 U.S. 123, 159-60, 28 S. Ct. 441, 52 L. Ed. 714 (1908), despite the text of the Eleventh Amendment."  Koslow v. Commonwealth of Pennsylvania, 302 F.3d 161, 168 (3d Cir. 2002).

Here, McBride brings suit against Defendant Raith to remedy "ongoing violations of federal law," namely the purportedly unconstitutional EM Program violation policy for which Raith is responsible.  As such, sovereign immunity does not bar McBride's claim against Raith.

F.    Qualified Immunity With Respect To Probation Officer Don Cahoone

Under the qualified immunity principle, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not

violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). We analyze two issues when evaluating a qualified immunity question: (1) whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right, and (2) whether the right at issue was "clearly established" at the time of defendant's alleged misconduct. Pearson v. Callahan, 555 U.S. 223, 232 (2009). In conducting our analysis, we have "discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Id. at 236.

In Hope v. Pelzer, 536 U.S. 730, 741 (2002), the Supreme Court declared that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Following the Supreme Court's lead, the Third Circuit "has adopted a broad view of what constitutes an established right of which a reasonable person would have known." Kopec v. Tate, 361 F.3d 772, 778 (3d Cir. 2004). Specifically, to be "clearly established" "merely means that in light of preexisting law, the unlawfulness of the official's conduct was reasonably and objectively apparent." McGreevy v. Stroup, 413 F.3d 359, 366 (3d Cir. 2005).

Here, for the reasons discussed in Section (II)(A), *supra*, McBride has alleged facts sufficient to show that Don Cahoone, McBride's probation officer, violated his Fourteenth Amendment due process rights by requesting a bench warrant for McBride's arrest and subsequently refusing to schedule a hearing concerning McBride's alleged EM Program violation. Additionally, McBride's right to a hearing under the circumstances was "clearly established" because, in light of preexisting law, the unlawfulness of Defendant Cahoone's conduct was reasonably apparent, even though the Third Circuit has not addressed the precise

19

factual circumstances at issue here.

In particular, the Third Circuit's 1999 decision in Asquith v. Dep't of Corrections, 186 F.3d 407 (3d Cir. 1999), over ten years ago, should have put Cahoone and other probation officers on notice that, unless they are merely transferring an inmate from one form of "institutional confinement" to another, some form of process (e.g., a hearing) is required before summarily sending someone to prison for missing a hook up appointment.  In other words, Asquith distinguished between an inmate in "institutional confinement," who did not have a protected liberty interest in retaining his status, and someone living in his own home, who did. See Asquith, 186 F.3d at 410-11.  This Third Circuit opinion, in combination with the numerous other circuit court opinions discussed in Section (II)(A), *supra,* that recognize a liberty interest in remaining at home, even with significant restrictions, suggest that a reasonable probation officer should have known that sending McBride to prison without a hearing was unlawful.

Defendants argue that Cahoone acted reasonably in refusing McBride's request for a hearing because "the judicially approved Procedure Manual affords no violation hearings to persons serving on the EMP pursuant to a 'Min/Max' sentence."  (Doc. No. 28, at 20).  We disagree.  First, the record before us contains no indication that the "Electronic Home Monitoring Program" section of APPS' Policy and Procedure Manual was "judicially approved."  The "authority" for Chapter 7.18 of the Manual resides in the Director of APPS, a position currently held by Defendant Raith.  Although Delaware County judges appoint and approve the Director of APPS, Defendant Raith himself is not a judge.  We simply do not know whether any judge, Delaware County or otherwise, has reviewed and/or approved the EM Program violation policy pursuant to which McBride was sent to prison without a hearing.

Second, at this early stage of the proceedings, we do not even know whether Defendant Cahoone complied with the violation policy behind which he now seeks shelter.  According to the policy, a probation officer must consult with a supervisor concerning a violation in order to decide on an appropriate course of action.  (Doc. No. 10 Ex. G).  In particular, the conferees must determine whether to merely issue a "warning slip," or alternatively, whether the violation is so severe as to justify requesting a bench warrant.  (Doc. No. 10 Ex. G).  Defendant Cahoone's notes detailing McBride's alleged violation make no mention of any consultation before Cahoone requested a bench warrant.  (Doc. No. 10 Ex. D).

Finally, Chapter 7.18 of the Manual states that "[i]f it is determined that the violation is severe then a bench warrant is requested *from the sentencing judge*."  (Doc. No. 10 Ex. G) (emphasis added).  Here, Judge Chad F. Kenney, not sentencing Judge James F. Nilon, signed the bench warrant for McBride.  (Doc. No. 33).  In light of these open factual questions, it would be imprudent to summarily conclude that Cahoone acted reasonably, as urged by Defendants.

G.    Quasi-Judicial Immunity With Respect To Probation Officer Don Cahoone

Under Third Circuit law, probation officers and parole officers enjoy "quasi-judicial" immunity when engaged in "adjudicatory" duties.  See Harper v. Jeffries, 808 F.2d 281, 284 (3d Cir. 1986).  Conversely, when a probation officer acts without discretion and performs a purely mandatory function, he is not immune from the consequences of his actions.  See Jones v. Johnson, 402 F. Supp. 992, 999 (E.D. Pa. 1975) ("When the function is purely mandatory, in accordance with the direct and positive legal authority applicable to the individual's position, and without any discretion involved in its performance, the policy basis for immunity— the need to permit the government to govern without fear of liability for errors which may occur in the

making of necessary decisions...— is no longer present.") (internal citation omitted).

The key question, then, is whether Cahoone was acting in an "adjudicatory" capacity when he sought a bench warrant for McBride and subsequently refused McBride's request for a hearing.  In the probation officer context, our courts have found that no absolute immunity attaches when the officer (1) investigates allegations of parole violations and crimes, (2) *types and signs warrants for the arrests of parole violators*, (3) assists police initiating investigations of crimes committed by parolees, (4) provides false information that a parolee violated the terms of parole or committed a crime, (5) performs the general responsibilities of a parole or probation officer, (6) presents information to a parole board about a parole violation, (7) conducts a warrantless search of a parolee's residence without probable cause, (8) *carries out a mandatory statutory duty* such as verifying information in a parolee's record, or (9) gathers information to prepare a presentence report.  Breslin v. Brainard, No. 01–CV–7269, 2002 WL 31513425, at *6-7  (E.D. Pa. Nov. 1, 2002) (internal citations omitted) (emphasis added).  On the other hand, absolute immunity attaches when the officer (1) hears evidence; (2) makes recommendations as to whether to parole a prisoner; or (3) makes decisions as to whether to grant, revoke or deny parole.  Id.

Here, Cahoone merely asked for a bench warrant after McBride failed to show-up for his hook up appointment and then told McBride that he could not have a hearing before a judge.  In doing so, Cahoone did not exercise any discretion at all.  He did not "decide" whether to grant McBride a hearing, but rather followed the procedures required by Chapter 7.18 of the APPS Policy and Procedure Manual.  Therefore, Cahoone's actions were not "adjudicatory," so the doctrine of "quasi-judicial" immunity will not shield him here.

H.      Quasi-Judicial Immunity With Respect To Defendant Raith

Although it is a closer question, we cannot conclude that "quasi-judicial" immunity forecloses McBride's claim against Defendant Raith.  In 1996, Congress amended 42 U.S.C. § 1983 to provide that "injunctive relief shall not be granted" in an action brought against "a judicial officer for an act or omission taken in such officer's judicial capacity...unless a declaratory decree was violated or declaratory relief was unavailable."  Neither the Supreme Court nor the Third Circuit has definitively held that this provision protects quasi-judicial actors performing tasks functionally equivalent to judges from actions for injunctive relief.  However, even if it does, and even if Raith can be properly considered a "judicial officer," § 1983 bars only those actions taken in a "judicial capacity."  Therefore, the question becomes whether Raith acts in a "judicial capacity" simply by virtue of enforcing APPS' allegedly unconstitutional EM violation policy.  We find that he does not.

In Schwartz v. Dennison, 518 F. Supp. 2d 560, 570 (S.D.N.Y. 2007), the court recognized that parole board officials, like judges, are entitled to absolute immunity from suit when they serve a quasi-adjudicative function, e.g., deciding whether to grant, deny or revoke parole.  Id. However, this immunity *does not* extend to the official responsible for an unlawful policy.  See id. ("Dennison, in contrast, did not preside over plaintiff's parole hearing, nor did he decide whether to grant, deny, or revoke plaintiff's parole. Instead, *plaintiff argues that he was responsible for an unlawful policy implemented by BOP.  Therefore he is not entitled to absolute immunity as a Parole Board official*.") (emphasis added).

Here, Raith is not a judge, but he was appointed by the President Judge and approved by the Board of Judges of Delaware County.  (Doc. No. 10 Ex. G).  However, he did not act in a

23

"judicial" or "adjudicatory" capacity merely by overseeing APPS' EM Program policy.  As held in Schwartz v. Dennison, an official responsible for an unlawful policy cannot claim absolute immunity from a plaintiff's suit seeking prospective relief from the policy.  See 518 F. Supp. 2d at 570.  It follows that neither § 1983 nor the doctrine of quasi-judicial immunity bars McBride's claim for prospective relief against Raith.

III.   Conclusion

      For the aforementioned reasons, Defendants' motion to dismiss (Doc. No. 28) is granted with respect to McBride's claims against entity Defendant APPS and denied in all other respects.

                           BY THE COURT:

                           /s/ Legrome D. Davis

                           Legrome D. Davis, J.